UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BRENT LAMAR GREEN,

        Petitioner,

                                       CASE NO. 2:02-CV-73841

    v.                             JUDGE DENISE PAGE HOOD

BLAINE C. LAFLER,

        Respondent.[1]

_____/

**<u>OPINION AND ORDER DENYING PETITION FOR THE WRIT OF HABEAS CORPUS</u>**

**I. OPINION**

A.    *Procedural History*

    1.      Petitioner Brent Lamar Green is a state prisoner, currently confined at the Boyer Road Correctional Facility in Carson City, Michigan.

    2.      On February 1, 1999, petitioner was convicted of assault with intent to commit murder, MICH. COMP. LAWS § 750.83, following a jury trial in the Oakland County Circuit Court. On March 8, 1999, he was sentenced as a second habitual offender, MICH. COMP. LAWS § 769.10, to a term of 20-40 years' imprisonment.

    3.      Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claims:

        I.        THE FAILURE TO HAVE THE EVIDENCE SENT TO A LABORATORY TO TEST FOR DNA ON THE BLADES OF THE KNIVES; WHOSE BLOOD WAS FOUND AROUND THE HOUSE, WHOSE FINGERPRINTS WERE ON THE KNIVES, AND WHETHER THERE

---

      [1]By Order entered this date, Blaine C. Lafler has been substitute in place of Barbara Bock as the proper respondent in this action.

WAS SEMEN ON THE SHEETS WHICH WOULD PROVE MR. GREEN'S INNOCENCE VIOLATES HIS RIGHTS UNDER BRADY V MARYLAND AND THE FAILURE OF COUNSEL TO ASK FOR IT IS INEFFECTIVE ASSISTANCE OF COUNSEL.

II.    MR. GREEN IS ENTITLED TO A RESENTENCING BECAUSE HIS CONSTITUTIONAL RIGHT TO BE SENTENCED BASED ON ACCURATE INFORMATION WAS VIOLATED WHEN THE TRIAL JUDGE BASED THE SENTENCE ON THE FACT THAT THIS WAS SOME SORT OF HATE CRIME TARGETED AGAINST A HOMOSEXUAL WHEN THERE IS NO EVIDENCE OF THAT FACT.

III.    MR. GREEN IS ENTITLED TO A RESENTENCING BECAUSE HIS CONSTITUTIONAL RIGHT TO BE SENTENCED BASED ON ACCURATE INFORMATION WAS VIOLATED WHEN THE TRIAL JUDGE RULED MR. GREEN HELD MR. MCCOY CAPTIVE SIGNIFICANTLY LONGER THEN WHAT WAS NECESSARY TO COMMIT THE OFFENSE.

IV.    THE TRIAL JUDGE ERRED WHEN THERE WAS A FINDING THAT MR. GREEN SHOWED NO REMORSE BASED ON PRESENTENCE REPORT THAT MAKES THE SAME CLAIM BECAUSE MR. GREEN STILL SAYS HE WAS IN SELF-DEFENSE.

The court of appeals found no merit to petitioner's claims, and affirmed his conviction and sentence.

See *People v. Green*, No. 218216, 2001 WL 721329 (Mich. Ct. App. Feb. 27, 2001) (per curiam).

4.    Petitioner, through counsel, sought leave to appeal to the Michigan Supreme Court, raising the following claims:

I.    THE TRIAL COURT'S INSTRUCTIONS ON SELF-DEFENSE FAILED TO ADEQUATELY PRESENT THE DEFENDANT'S CLAIM OF SELF-DEFENSE TO THE JURY.

II.    TRIAL COUNSEL WAS INEFFECTIVE BY FAILING TO REQUEST SCIENTIFIC TESTING ON CERTAIN KEY PIECES OF EVIDENCE.

III.    THE TRIAL COURT RELIED ON INACCURATE AND/OR IMPERMISSIBLE INFORMATION IN FASHIONING DEFENDANT'S SENTENCE.

The Supreme Court denied petitioner's application for leave to appeal in a standard order. *See*

2

*People v. Green*, 465 Mich. 880, 635 N.W.2d 316 (2001).

5.     On September 25, 2002, petitioner, through counsel, filed an application for the writ of habeas corpus, claiming that he was denied a fair trial by the court's failure to give a specific instruction that he could use deadly force to resist an imminent sexual assault, rather than a general self-defense instruction, and that trial counsel was ineffective for failing to request such an instruction.  On July 31, 2003, the Court granted respondent's motion to dismiss the petition for lack of exhaustion and dismissed the petition without prejudice to petitioner refiling his claims after exhausting state court remedies.

6.     Petitioner thereafter returned to the trial court, filing through counsel a motion for relief from judgment pursuant to MICH. CT. R. 6.500-.508, raising the following claim:

> THE INSTRUCTIONS PROVIDED AT TRIAL FAILED TO ADEQUATELY PRESENT THE DEFENDANT'S CLAIM OF SELF-DEFENSE TO THE JURY AND TRIAL COUNSEL WAS INEFFECTIVE BY FAILING TO REQUEST SAME.

On September 4, 2003, the trial court denied petitioner's motion for relief from judgment.  The trial court concluded that the claim was barred by MICH. CT. R. 6.508(D)(3), because petitioner could have raised the claim on direct appeal.  The court also found that petitioner could not establish "good cause" for his failure to raise the claim so as to permit review under MICH. CT. R. 6.508(D)(3)(a) because petitioner did not allege that appellate counsel was ineffective for failing to raise the claim on direct appeal.  *See People v. Green*, No. 98-161150-FC (Oakland County, Mich., Cir. Ct. Sept. 4, 2003).  The Michigan Court of Appeals and Michigan Supreme Court denied petitioner's applications for leave to appeal in standard orders, based on petitioner's "failure to meet the burden of establishing entitlement to relief under MCR 6.508(D)."  *People v. Green*, 472 Mich. 914, 697 N.W.2d 152 (2005); *People v. Green*, No. 254256 (Mich. Ct. App. Aug 20, 2004).

3

7.      On July 1, 2005, petitioner through counsel filed a motion to reopen his habeas

action.  The Court granted the motion on March 27, 2006.

8.      Respondent filed his answer on July 28, 2007.  He contends that petitioner's claims

are barred by petitioner's procedural default in the state courts.

B.      *Factual Background Underlying Petitioner's Conviction*

Petitioner was convicted of assault with intent to commit murder in connection with the July

19, 1998, stabbing of Joseph McCoy.  The evidence adduced at trial was accurately summarized in

the prosecutor's brief to the Michigan Court of Appeals on petitioner's direct appeal:

> Oak Park Public Safety Officer Diana Griffin testified that she was working
> on July 19, 1998, at 5:25 p.m., when she was dispatched to a call of family trouble
> with struggling heard in the background of a 911 call which had been made.  (Trial
> Transcript, January 26, 1999, volume II [III], 3, 23).  By the time Griffin arrived, she
> heard a man, three or four doors down from where she had been sent, shouting for
> help and that a man had been stabbed.  (II, 4).  When Griffin walked over, she saw
> Joseph McCoy, the victim, covered in blood from head to toe lying on a porch with
> another man covering McCoy's chest with his hand.  (II, 5).
>
> Griffin told Raesschert, another officer who arrived shortly after she did, that
> he needed to get his medical gear.  (II, 7).  Griffin also told the dispatcher that an
> ambulance was needed.  (II, 7).
>
> As Raesschert worked on McCoy, McCoy was going in and out of
> consciousness.  (II, 7).  Fearing that McCoy might die, Griffin began to ask him
> questions.  (II, 7-8).  McCoy said that he had been stabbed by a man named Brent.
> (II, 8).  When asked what happened, McCoy said that he did not know.  (II, 8).
> McCoy stated that he had woken up and that Brent was standing over him with a
> knife and then just stabbed him in the chest.  (II, 8, 25-27).
>
> McCoy described Brent as a man with a shaved head.  (II, 24).  McCoy added
> that Brent worked for Detroit's parking enforcement agency.  (II, 25).
>
> Eventually, Griffin went to McCoy's townhouse.  (II, 9-10).  Griffin stayed
> on the porch until more backup arrived because she did not know if anyone was
> inside.  (II, 10-11).  Griffin did not hear any sound coming from the townhouse.  (II,
> 10, 14).
>
> When backup arrived, a lamp came crashing through the front window.  (II,
> 12).  Griffin jumped off the porch and drew her weapon in time to see a man flying
> through the glass window.  (II, 12).  Griffin ordered the man to lie on the ground.
> (II, 13).  The man was covered in blood and screaming wildly.  (II, 13).  Griffin
> identified the man as defendant.  (II, 13).  Defendant was screaming: "He's after me,

4

he's going to kill me, he's going to kill me, he tried to kill me." (II, 13-14, 27). Defendant also stated: "He tried to stab me." (II, 27-28). Defendant then started running with his hands in the air. (II, 14, 28-29). Defendant ran away from the uniformed police officers. (II, 14-15).

All the officers were screaming for defendant to lie down on the ground, but he kept running. (II, 15). Defendant evaded one officer's attempt to trip him, but was then tackled by another officer. (II, 15). Defendant was handcuffed. (II, 16).

The other officers went into the townhouse after kicking in the locked front door. (II, 16, 20).

Defendant told Griffin that he had come to McCoy's townhouse to party. (II, 29). Defendant and McCoy drank sixteen Miller Ices between them. (II, 30). They also talked and listened to music. (II, 30). Defendant then told Griffin that he did not "get into [that] fag shit." (II, 17, 31). Defendant told Griffin that he had been sleeping and, when he woke up, McCoy was over him with the knife. (II, 17). Defendant claimed to have wrestled the knife away from McCoy and then stabbed him in the chest. (II, 17, 39). Defendant was covered with blood, but when Griffin checked him over, she found only some cuts on his hands and above his left eye. (II, 22). Griffin noted that defendant smelled of alcohol. (II, 31).

As defendant was being led to the police car, he repeatedly screamed in McCoy's direction: "I hope you fucking die. Yeah, I meant to do it." (II, 18).

When Griffin finally went inside McCoy's townhouse, she saw blood everywhere. (II, 19). There appeared to have been a struggle because chairs were tipped over and things were knocked on the ground. (II, 20).

Joseph McCoy testified that he was thirty-six years' old. (II, 44). On July 19, 1998, he went to Palmer Park, a place where gay and bisexual people gather, to meet someone whom he had met at a party the night before. (II, 46, 50). McCoy testified that he had been drinking that night and was intoxicated. (II, 119). At the park, defendant walked up to McCoy's car and told him that he was the person McCoy was supposed to meet. (II, 49-50). McCoy indicated that he was not certain that defendant was the man he was supposed to meet, but he suggested that they talk. (II, 50-51, 111-112). Eventually, McCoy let defendant into his car and they talked and listened to music. (II, 52). Defendant told McCoy that he worked from the city of Detroit. (II, 53). Defendant asked McCoy if he was interested in getting into some sex, but McCoy did not respond. (II, 53).

McCoy told defendant that he had to go to meet some friends and that he was going out to Kensington Park. (II, 54). McCoy also told defendant that he had to buy some beer. (II, 55). McCoy invited defendant to come with him. (II, 56). McCoy and defendant then went to McCoy's townhouse. (II, 54-55).

McCoy took some beers out of his refrigerator. (II, 57). McCoy and defendant went to the front room and sat down on separate sofas, listening to music and drinking beer. (II, 60-62). Defendant asked McCoy if McCoy "was going to stay over there [on his separate sofa] the whole entire time." (II, 63). McCoy stated "probably not." (II, 63). McCoy got up and sat by defendant. (II, 64). Defendant then started telling McCoy that he could drink more than McCoy could. (II, 64).

5

Eventually, defendant and McCoy touched each other. (II, 66). Defendant removed his shorts and shirt. (II, 66, 132-133). McCoy removed his shirt. (II, 37, 132). Defendant and McCoy touched and kissed. (II, 67). McCoy removed his shorts. (II, 68). Defendant performed oral sex on McCoy. (II, 68-69, 97, 145). McCoy admitted that he had previously denied that anything sexual had occurred between defendant and himself, but that was because McCoy, who had just been released from the hospital, was uncomfortable discussing his sexual activities. (II, 100). McCoy also stated that at his preliminary examination, he had had an attractive female assistant prosecutor and defendant's attorney was implying that McCoy's relationship with defendant had been more intimate than it was. (II, 100-101).

After the sexual activity, McCoy told defendant that McCoy had to go to meet his friends. (II, 70). McCoy took another beer out of the refrigerator for himself as well as for defendant. (II, 70). McCoy went upstairs, leaving defendant downstairs. (II, 70-71). When McCoy went upstairs, his VCR was inside his entertainment unit which was up against the wall. (II, 71-72). McCoy thought that he and defendant had at least four beers apiece. (II, 149).

After McCoy had changed his shorts and was deciding what top to wear, he fell asleep on his bed. (II, 76, 146).

McCoy awoke to feel something sharp going into him. (II, 76, 151). McCoy saw defendant straddled over him. (II, 76-77). Defendant had a silver object in his hand. (II, 76). At least twice, defendant told McCoy: "[Y]ou're going to die." (II, 78-79). McCoy realized that he had been stabbed. (II, 78).

McCoy pushed defendant off and then went out to the hallway (II, 79-80). Defendant followed McCoy and a struggle occurred, during which defendant repeated that McCoy was going to die. (II, 80). McCoy and defendant continued struggling and McCoy pushed defendant down the stairs. (II, 82, 124-125). McCoy then tried to get by defendant, who was lying at the bottom of the stairs. (II, 82, 124-126).

McCoy realized that he had to call 911 and went to the kitchen to use the telephone. (II, 82, 125, 127). McCoy told the 911 operator that he needed help and then defendant grabbed the telephone. (II, 84, 144-145). At that time, defendant poked McCoy with butter and steak knives which he must have removed from the kitchen drawer. (II, 84-85, 128-129, 144-145). The knives were not sharp and only made scratches across McCoy's shoulder, face and neck. (II, 84, 136, 140).

McCoy tried to get out the back door after opening it, but defendant slammed it shut. (II, 86, 129-131). The struggle continued, but McCoy eventually reached the front door. (II, 87). Defendant was trying to close the door after McCoy opened it, but McCoy got out. (II, 88).

McCoy went to [a] neighbor's house and rang the doorbell, but no one came. (II, 88). McCoy sank onto the porch and called out for help. (II, 88).

McCoy moved to another neighbor's home and rang the bell. (II, 89). McCoy then collapsed in front of the door. (II, 89). A woman came to the front door and screamed. (II, 89). A man, who identified himself as a law enforcement officer, came out of the house. (II, 89). The man was telling McCoy to stay awake. (II, 89).

McCoy did not recall the police being there.  (II, 90).

McCoy denied that he had threatened defendant or that he had any weapon. (II, 85-86).

McCoy was hospitalized for seven days.  (II, 93).  McCoy had fifty stitches to close his wound.  (II, 93).

Doctor Yousif Goriel testified that he first saw McCoy in the operating room. (II, 154).  McCoy had a stab wound in the left side of his chest which was ten centimeters long and approximately four inches deep.  (II, 154, 159).  The left lobe of McCoy's liver was also cut.  (II, 157).  McCoy's injury was serious.  (II, 158).

While one portion of the medical records indicated that McCoy did not have injuries to his face or head, the Intensive Care Unit (ICU) records stated that McCoy had multiple small lacerations to his head, eyes, ears, nose and throat areas.  (II, 166, 169-170).

McCoy's medical records were admitted.  (II, 171).

Oak Park Detective Sergeant Brent Hostutler testified that he spoke to McCoy in the ICU the morning after his surgery.  (Trial Transcript, January 28, 1999, volume III [III], 4).  Hostutler ended the interview after ten to fifteen minutes when McCoy's heart monitor sounded.  (III, 5).

McCoy told Hostutler that he had met defendant at a party.  (III, 6-7). McCoy told Hostutler that defendant had asked him for sex and that they had had unspecified sex.  (III, 7-8).

Wayne County Deputy Sheriff Kendall James testified that on July 19, 1998, he was having a barbeque at his in-laws' house at approximately 5:30 p.m.  (III, 14-15).  There was a loud knock at the door and James' brother-in-law and wife went to the door.  (III, 15).  James then heard his wife scream his name.  (III, 15).  James saw McCoy on the porch, covered in blood with his eyes rolled to the back of his head.  (III, 16).  After checking to see that no one else was coming, James told his wife to call 911 and went to get some paper towels.  (III, 17).  James put paper towels on McCoy's wound.  (III, 17).  James was smacking McCoy and telling him: "Hey, if you got to sleep on me, you're going to die."  (III, 17).  James was asking McCoy who had done this and McCoy was mumbling "Joe [McCoy's name]."  (III, 17-18).

When the police came, James heard McCoy tell them that the man responsible might still be in his townhouse.  (III, 25).

James heard a loud crash, saw the police chasing defendant and heard defendant say: "I'll kill him.  I'll kill him."  (III, 27).

Eventually, McCoy was taken away by ambulance.  (III, 21).

Rachel James testified that she went to the door and saw McCoy, who was shirtless and in black shorts, bleeding on the porch.  (III, 29).  Rachel James called for her husband.  (III, 30).  Rachel James called 911.  (III, 31).

Later, Rachel James saw the police chasing a man, who was yelling: "I'll kill him."  (III, 33, 39).

Duane Geary testified that he was McCoy's neighbor.  (III, 40).  Kendall James was Geary's son-in-law.  (III, 41).  Geary saw McCoy on the front porch.  (III,

7

43).  After Geary came out of the house, he saw a man crash through a window and run while saying something.  (III, 44, 48).  When the man saw that he was surrounded, he stopped.  (III, 44, 48).  The man was wearing a white shirt and blue shorts.  (III, 46).

Oak Park Police Officer Richard Robell testified that as he pulled up to McCoy's townhouse, he saw defendant in front of the window.  (III, 51-52).  Robell then saw a lamp shade come through the window.  (III, 53).  Defendant began to knock out glass with his hands and feet.  (III, 53).  Defendant jumped through the window.  (III, 53).

Robell was yelling for defendant to stop and stay still, but defendant jumped up and started running.  (III, 54).  Several officers were chasing defendant and one dove at him, but missed.  (III, 55).  Robell then tackled defendant.  (III, 56).  Defendant stated that there was someone inside the townhouse trying to kill him.  (III, 56, 116-117).  Defendant was covered with blood.  (III, 61).  When Robell looked over defendant, he found a small cut on his leg.  (III, 61).  Defendant was wearing shorts and a shirt and did not appear intoxicated.  (III, 115, 117-118).

Robell directed the officers to get a shotgun because he decided that they need to go into the townhouse.  (III, 57).  The officers broke down the front door which had been locked.  (III, 57).  When Robell looked at the front door, he saw that to open it a person would have to have a key.  (III, 58).  When Robell looked at the back door, he saw that it also need a key to release the deadbolt.  (III, 58-59).

Robell saw obvious signs of a struggle, including knocked over furniture.  (III, 59, 118).

Robell took pictures at the scene and collected evidence.  (III, 61-62).  The pictures were admitted.  (III, 63-85).  Robell found two steak knives, a butter knife and the blade of a cake knife on the carpet in the living room.  (III, 65-66, 88-89).  Robell found the handle of the cake knife nearly under a dresser in the master bedroom.  (III, 67, 82, 98).

The bed, sheets and pillows had blood on them.  (III, 81).

Robell took a picture of the blood on the ceiling near the front door.  (III, 69).  There was also blood on the wall next to the front door and the door itself.  (III, 70).  There was blood on the door jamb.  (III, 71).

There was a hole in the closet door which Robell believed had been made by a steak knife which he had found bent in half.  (III, 71, 87).

Robell found a pool of blood at the top of the stairs.  (III, 73).  Robell also found McCoy's rope neck chain on the floor.  (III, 75).  There was blood on the wall at the stair area.  (III, 73).  There was blood on the stair railing and one of the stair railings was knocked off the wall.  (III, 74, 119).

The rear door had a blood smear on it as did the wall.  (III, 76-77).  The rear door had two droplets of blood on its outside surface.  (III, 78).

The kitchen table had an unplugged VCR on it.  (III, 76-77).  Under a kitchen chair, there was a steak knife.  (III, 77, 100).

The stove, a chair and the floor had blood on them.  (III, 78).

The kitchen telephone was covered with blood and that area had a lot of

8

blood around it.  (III, 78).  The kitchen telephone had been disconnected from the wall.  (III, 78-79).  Only one kitchen drawer had blood on it and in it.  (III, 80, 107).

There were blood drops leading from McCoy's townhouse down the walk.  (III, 85).

Robell took a picture of the blood on Geary's front porch.  (III, 83-84).

The 911 tape was played for the jury.  (III, 97-98). . . .  On the tape, McCoy is heard asking defendant to let him go.  A struggle and yelling can be heard in the background.  McCoy is heard saying: "Please–save me–please save me."  Defendant then takes the telephone and tells the 911 operator that: "My man's trippin'."  McCoy is heard saying: "Help, police . . . help police."  The 911 operator is then heard relating that defendant told her that he was having trouble with an intoxicated person.  Defendant then hangs up the telephone.

After playing the tape, the People then rested.  (III, 125).

The parties stipulated that the following statement of Alicia Berry, McCoy's neighbor, would be admitted:

> I heard several bumps 15 minutes before the police arrived.  I then saw him from the police from the window.  I live next door to the 'accused' person.  The bump sounded like their [sic] was some tusseling [sic] going on.  The person who was running from the police was a black male.  The bumps appeared to come from the second floor.

(III, 126).

Defendant admitted his medical records.  (III, 127).

Defendant rested.  (III, 127).

The jury convicted defendant as charged.  (V, 2-3).

Pl.-Appellee's Br. on Appeal, in *People v. Green*, No. 218216 (Mich. Ct. App.), at 1-10.

## C.  *Procedural Default*

Respondent first contends that petitioner's claims are barred by petitioner's procedural default in the state courts, because petitioner failed to raise these claims on direct appeal.  The Court agrees.

### 1.  *Default of the Claims*

Under the procedural default doctrine, a federal habeas court will not review a question of federal law if the state court's decision rests on a substantive or procedural state law ground that is independent of the federal question and is adequate to support the judgment.  *See Coleman v.*

*Thompson*, 501 U.S. 722, 729 (1991). However, "a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on the procedural bar." *Harris*, 489 U.S. at 263. Furthermore, "only a 'firmly established and regularly followed state practice' may be interposed by a State to prevent subsequent review . . . of a federal constitutional claim." *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991) (quoting *James v. Kentucky*, 466 U.S. 341, 348-51 (1984)); *see also*, *Calderon v. United States Dist. Ct. for the E. Dist. of Cal.*, 96 F.3d 1126, 1129 (9th Cir. 1996) (internal quotation omitted) ("For the procedural default doctrine to apply, a state rule must be clear, consistently applied, and well-established at the time of the petitioner's purported default.").

Here, petitioner presented his purportedly defaulted habeas claims in his motion for relief from judgment. Michigan Court Rule 6.508, governing motions for relief from judgment, provides that the movant "bears the burden of establishing entitlement to relief." MICH. CT. R. 6.508(D). The rule goes on to provide, in three separately numbered paragraphs, procedural situations in which relief will not be granted: (1) where an appeal relating to the conviction is pending; (2) where the claim has already been ruled upon in a prior appeal or postconviction motion; and (3) where the claim could have been raised in a prior appeal or postconviction motion but was not. *See* MICH. CT. R. 6.508(D)(1)-(3).

The Michigan Court of Appeals and the Michigan Supreme Court both rejected petitioner's appeal based on his "failure to meet the burden of establishing entitlement to relief under MCR 6.508(D)." Further, the trial court explicitly invoked Rule 6.508(D)(3), concluding that the claims were barred because petitioner had failed to raise them on direct appeal in the Michigan Court of

10

Appeals and could not establish "good cause" for his failure to do so. This is sufficient to constitute a clear and express invocation by the Michigan courts of the firmly established default rule set forth in Rule 6.508(D)(3). *See Simpson v. Jones*, 238 F.3d 399, 408 (6th Cir. 2000).

This conclusion is not altered by the Sixth Circuit's subsequent decision in *Abela v. Martin*, 380 F.3d 915 (6th Cir. 2004). In that case, the court explained that its previous decisions in *Simpson* and *Burroughs v. Makowski*, 282 F.3d 410 (6th Cir. 2003), were based on the fact that the lower state courts in those cases had expressly invoked the procedural aspect of Rule 6.508(D)(3), and therefore the court could be fairly certain that the Michigan Supreme Court's citation to "MCR 6.508(D)" was intended as an invocation of the procedural aspect of that rule. In *Abela*, however, the lower courts had addressed the petitioner's claims on the merits, and this was enough for the Sixth Circuit to distinguish *Simpson* and *Burroughs* and conclude that the state appellate courts had not "clearly and expressly" invoked the procedural bar of Rule 6.508(D)(3). *See Abela*, 380 F.3d at 923-24. Here, as in *Simpson* and *Burroughs* and unlike *Abela*, the trial court itself clearly and expressly relied on the procedural bar of Rule 6.508(D)(3). Thus petitioner's claim is barred by his procedural default in the state courts, and the Court may not review the claim on the merits unless petitioner satisfies one of the two exceptions to the procedural default rule.

In his motion to reopen, petitioner contends that the state courts' refusal to consider his claim on the merits resulted from an "exorbitant application" of Rule 6.508(D) and was based on his failure to use certain "magic words" regarding appellate counsel's ineffectiveness, and that because the substantive issues he presents are clear and manifest, and the prejudice real and substantial, his case is the type of "exceptional case" discussed in *Lee v. Kemna*, 534 U.S. 362 (2001), *Osborne v. Ohio*, 495 U.S. 103 (1990), and *Davis v. Wechsler*, 263 U.S. 22 (1923). None of these cases

11

compels the conclusion that petitioner's claims are not barred by a procedural default.  In *Lee*, the Court relied on *Osborne* and *Davis* for the proposition that notwithstanding the general procedural default rule there are "exceptional cases in which exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question."  *Lee*, 534 U.S. at 376.  The Court described such cases as comprising a "limited category."  *Id*.  Although the Court did not spell out a comprehensive definition of an "exceptional case," it explained that "[t]hree considerations, in combination," led it to conclude that the case before it fell "within the small category of cases in which asserted state grounds are inadequate to block adjudication of a federal claim."  *Id*. at 381.  Specifically, in that case the defendant had substantially complied with the procedural rule, the rule was being applied in a novel factual setting which was not addressed by prior caselaw, and the judge denied the relief sought by the defendant on a basis which would not have been corrected by rigorous compliance with the procedural rule.  *See id*. at 381-85.

Here, there are no factors present such as in *Lee* to suggest that petitioner's case is part of the narrow category of exceptional cases for which an asserted procedural default will not bar federal review.  Petitioner did not substantially comply with the procedural rule; rather, he wholly failed to raise either of his habeas claims on direct appeal.  Petitioner's case is not novel; it is a straightforward application of the well-established rule that all available claims must be raised on direct appeal.  Nor did the trial court decline to review petitioner's claims because he had failed to use any "magic words" with respect to ineffective assistance of appellate counsel; petitioner failed to use any words at all with respect to such a claim, and failed to raise any claim in his motion for relief from judgment that appellate counsel was ineffective for failing to raise the claims on direct appeal.  In short, there was nothing exceptional or exorbitant about the trial court's application of

12

the Rule 6.508(D)(3) procedural bar in petitioner's case.  *See Woods v. Cockrell*, 62 Fed. Appx. 556,

2003 WL 1202760, at *3 (5th Cir. 2003); *Owsley v. Luebbers*, 281 F.3d 687, 689-90 (8th Cir. 2002);

*Daniels v. Jones*, No. 4:03-cv-57, 2008 WL 5246467, at *12 (W.D. Mich. Dec. 16, 2008).  Nor is

this conclusion altered by the fact that petitioner raises important and, in his view, meritorious

constitutional claims.  "[T]he very existence of [the procedural default doctrine] presupposes that

meritorious claims will not be considered."  *Banks v. Ludwick*, No. 07-12821, 2008 WL 2397627,

at *4 (E.D. Mich. June 11, 2008) (Cohn, J., adopting Report of Komives, M.J.) (statute of limitations

case); *see also*, *Godfrey v. Patrick*, No. 05-1106, 2006 WL 3692598, at *14 (W.D. Pa. Dec. 12,

2006); *cf. Schlup v. Delo*, 513 U.S. 298, 316 (1995) ("Without any new evidence of innocence, even

the existence of a concededly meritorious constitutional violation is not in itself sufficient to

establish a miscarriage of justice that would allow a habeas court to reach the merits of a barred

claim.").  Accordingly, petitioner's claims are procedurally defaulted.

    2.    *Cause and Prejudice*

       The first exception to the procedural default rule is the cause and prejudice exception.  Under

this exception, review of an otherwise barred claim is allowed if petitioner is able to demonstrate

cause for, and prejudice attributable to, his default.  *See Coleman*, 501 U.S. at 750; *Maples v.

Stegall*, 340 F.3d 433, 438 (6th Cir. 2003).

                                                          *a. Cause*

       To establish "cause," petitioner must "show that some objective factor external to the defense

impeded counsel's efforts to comply with the State's procedural rule."  *Murray v. Carrier*, 477 U.S.

478, 488 (1986); *see also*, *Coleman*, 501 U.S. at 753.  Here, petitioner has not identified, and the

state court records do not reveal, any objective factor external to the defense which prevented

13

petitioner or his counsel from raising his jury instruction and ineffective assistance of trial counsel claims on direct appeal.

While constitutionally ineffective assistance of counsel may constitute cause to excuse a procedural default, *see Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Murray*, 477 U.S. at 488, appellate counsel's failure to raise petitioner's habeas claims on direct appeal cannot constitute cause here, because petitioner has not exhausted any ineffective assistance of appellate counsel claim. As the Supreme Court has observed, "in certain circumstances counsel's ineffectiveness in failing properly to preserve the claim for review in state court will suffice" to establish cause. *Edwards*, 529 U.S. at 451 (citing *Murray*, 477 U.S. at 488-89). In order to constitute cause, however, counsel's performance must amount to ineffective assistance of counsel under the Sixth Amendment. *See id*. "In other words, ineffective assistance adequate to establish cause for the procedural default of some *other* constitutional claim is *itself* an independent constitutional claim." *Id*. For this reason, the ineffective assistance claim which is asserted as cause must itself be both exhausted, *see id*. at 451-52 (discussing *Murray*, 477 U.S. at 489), and not procedurally defaulted, *see id*. at 452-53.

Here, petitioner has never presented, in any fashion, a claim that his appellate counsel was ineffective for failing to raise these claims on direct appeal. Petitioner's motion for relief from judgment in the trial court did not so much as mention any ineffectiveness by appellate counsel. An ineffective assistance of appellate counsel claim, therefore, has not been exhausted, and cannot be used as a basis to establish cause to overcome his procedural default. *See Lott v. Coyle*, 261 F.3d 594, 608-09 (6th Cir. 2001).

Because petitioner must establish both cause and prejudice, his failure to establish cause

14

makes it unnecessary to consider the prejudice issue. *See Hargrave-Thomas v. Yukins*, 374 F.3d 383, 389 (6th Cir. 2004); *Bonilla v. Hurley*, 370 F.3d 494, 497 (6th Cir. 2004). Nevertheless, as noted below even if petitioner could establish cause, he cannot establish prejudice because his claims are without merit. *See Nunn v. Yukins*, No. 98-2309, 2000 WL 145378, at *1 (6th Cir. Feb. 4, 2000) (no prejudice where defaulted claims were meritless); *Jacobs v. Scott*, 31 F.3d 1319, 1328 (5th Cir. 1994) (same); *Alvarez v. Straub*, 64 F. Supp. 2d 686, 696 (E.D. Mich. 1999) (Rosen, J., adopting Report & Recommendation of Komives, M.J.) (same).

### b. Prejudice

Petitioner also cannot establish prejudice, because his underlying constitutional claims are without merit. At trial, the court gave a general self-defense instruction which instructed the jury that petitioner was entitled to use deadly force to repel an imminent threat of death or great bodily harm. The court did not specifically instruct, however, that deadly force could be used to repel an imminent sexual penetration. Petitioner contends that the trial court's failure to give such an instruction *sua sponte* deprived him of a fair trial, and that counsel's failure to request such an instruction amounted to constitutionally ineffective assistance.

Under Michigan law, a defendant who presents sufficient evidence to support the instruction is entitled to an instruction that deadly force may be used to repel an imminent sexual penetration. *See People v. Heflin*, 434 Mich. 482, 456 N.W.2d 10 (1990). Petitioner contends that he was denied a fair trial by the court's refusal to give such an instruction *sua sponte*. This claim does not state a cognizable basis for habeas relief. Apart from lesser offense instructions in death penalty cases, *see Beck v. Alabama*, 447 U.S. 625, 637-38 (1980) (trial court required to instruct *sua sponte* on lesser included offenses where the failure to do so would result in the jury being given an "all or nothing"

15

choice of convicting on the capital charge or acquitting the defendant), the Supreme Court has never held or suggested that a trial court's failure to give an unrequested instruction amounts to a due process violation, and thus no clearly established federal law supports petitioner's claim as required for relief under 28 U.S.C. § 2254(d)(1).[2]  Further, as the Sixth Circuit has repeatedly recognized, "[a] trial judge's failure to give an unrequested instruction is not an error cognizable in a federal habeas proceeding." *Miller v. Grant*, No. 93-2081, 1994 WL 102977, at *2 (6th Cir. Mar. 25, 1994) (citing

---

[2]Section 2254 provides, in relevant part:
> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  Under this provision, "the 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also, Smith v. Cone*, 535 U.S. 685, 694 (2002).  "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also, Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694.  "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also, Bell*, 535 U.S. at 694.  However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous.  The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also, Williams*, 529 U.S. at 409.  By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court."  Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412.  Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.'  In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

*Manning v. Rose*, 507 F.2d 889, 895 (6th Cir. 1974)); *accord Bailey v. Smith*, No. 06-14099, 2008 WL 2607830, at *14 (E.D. Mich. June 30, 2008) (Hood, J., adopting Report of Komives, M.J.). Thus, petitioner cannot show that he was denied a fair trial by the court's failure to give the instruction *sua sponte*.

Further, petitioner cannot show that he was denied a fair trial because he was not entitled to the self-defense/sexual penetration instruction as a matter of state law. It is well established that the failure to give a self-defense instruction "does not deprive the defendant of his constitutional right to due process if the evidence produced during trial was insufficient to warrant such an instruction." *Allen v. Morris*, 845 F.2d 610, 617 (6th Cir. 1988); *see also*, *Gimotty v. Elo*, 40 Fed. Appx. 29, 33-34 (6th Cir. 2002). Under Michigan law, a defendant is entitled to instruction on a defense theory of the case where the instruction is supported by the evidence presented at trial. *See People v. Mills*, 450 Mich. 61, 81, 537 N.W.2d 909, 919-20 (1995). Here, there was some evidence presented which supported a general self-defense instruction. The victim's testimony and the 911 call established that there was a confrontation between the victim and petitioner. Although a very weak self-defense claim, the jury could have found the victim's testimony not credible and concluded that the victim, not petitioner, was the aggressor in the confrontation and thus concluded that petitioner acted in self-defense. However, there was not a scintilla of evidence presented that the victim had tried to sexually assault petitioner. Petitioner himself did not testify, and nothing in the testimony of the victim or the police officers, or in the 911 tape, raises any suggestion that the victim had tried to sexually assault petitioner. The only suggestion that petitioner acted to resist an imminent sexual assault came from defense counsel during opening statement and closing argument; counsel's statements, however, are not evidence, and thus do not constitute sufficient *evidence* to have

17

supported the giving of a specific instruction on using deadly force to resist a sexual assault.

Nor can petitioner show that his counsel's failure to request such an instruction amounted to constitutionally ineffective assistance of counsel.  To establish that counsel's ineffectiveness violated his Sixth Amendment right to counsel, petitioner must show: (1) counsel's errors were so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;" and (2) counsel's deficient performance prejudiced the defense.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  *Id*. at 687.  With respect to the performance prong of the inquiry, a strong presumption exists that counsel's behavior lies within the wide range of reasonable professional assistance.  *See id.*  at 689; *O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994).  "[D]efendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citation omitted).  "[T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*. at 690.  With respect to the prejudice prong, the reviewing court must determine, based on the totality of the evidence before the factfinder, "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id*. at 695.

Here, petitioner cannot establish that he was prejudiced by counsel's performance, for two reasons.  First, as explained above, there was absolutely no evidence presented at trial to support the giving of a specific instruction that deadly force could be used to resist an imminent sexual assault.  Second, even had such an instruction been given, there is not a reasonable probability that the result of the proceeding would have been different.  As noted above, there was absolutely no evidence presented that the victim had attempted to sexually assault petitioner.  The victim's testimony, if

18

believed by the jury, established that petitioner had assaulted him with a knife for no apparent reason, and that petitioner was the aggressor in the confrontation. The victim's testimony was supported by the 911 tape, which revealed the victim asking for help and petitioner attempting to dissuade the 911 operator from sending help. These statements to the 911 operator were wholly inconsistent with petitioner's later claim to have been the victim of the confrontation. Further, the severe injuries inflicted on the victim, against the lack of injury to petitioner, although not dispositive certainly cast some doubt on petitioner's self-defense claim. The physical evidence–large amounts of blood on the victim's bed and in the kitchen, also supported the victim's testimony regarding how the assault transpired. In short, given the significant evidence against petitioner and the paucity of evidence to support petitioner's self-defense claim, there is not a reasonable probability that the result of the proceeding would have been different had counsel requested a specific instruction that deadly force could be used to resist an imminent sexual assault.

Petitioner's reliance on *Barker v. Yukins*, 199 F.3d 867 (6th Cir. 1999), does not alter either conclusion reached above, notwithstanding petitioner's argument that his case is identical to *Barker*. In *Barker*, the petitioner's counsel had requested a specific instruction that deadly force could be used to repel an imminent sexual assault. The trial court had denied that request. On appeal, the Michigan Supreme Court agreed that the trial court had erred in refusing to give the instruction, but concluded that the error was harmless beyond a reasonable doubt. Specifically, the Michigan Supreme Court reached this conclusion based on the fact that a general self-defense instruction had been given, and on evidence that the petitioner was significantly larger and more fit than the enfeebled victim. The Sixth Circuit granted habeas relief, concluding that the error was not harmless because it had a substantial and injurious effect on the jury's verdict. As explained by the Sixth

19

Circuit in a later case:

> Essentially two reasons were given in support of the conclusion that the state court had unreasonably applied federal law in its harmless-error analysis.  First, this court stated that the general self-defense instruction left the door open for the jury to find that Barker understood that she was going to be the victim of an imminent rape, but that she was not about to be subjected to death or great bodily injury.  That possibility caused this court to have "grave doubt as to whether the erroneous jury instruction created a substantial and injurious influence on the verdict."  Furthermore, this court went on to state that the Michigan Supreme Court's harmless-error analysis "improperly invaded the province of the jury" in determining that "no reasonable juror could have believed that the force used by Barker was necessary to prevent rape by an 81-year old 'enfeebled' man."  According to this court, the proper role of a judge in reviewing a conviction is not "to stand in the place of the jury, weighing competing evidence and deciding that some evidence is more believable than others."  This court thus concluded that the Michigan Supreme Court unreasonable applied federal law.

*Benge v. Johnson*, 474 F.3d 236, 249 (6th Cir. 2007) (citation omitted) (discussing *Barker*, 199 F.3d at 873-76).

Notwithstanding the superficial similarities between petitioner's case and *Barker*, *Barker* has no application here.  With respect to petitioner's underlying substantive claim that he was denied due process by the failure to give the instruction, his case is distinguishable from *Barker* on two bases.  First, in *Barker* the petitioner had requested the instruction at trial, and the Michigan Supreme Court had found that it was error to refuse to give the instruction.  The only question in *Barker* was whether that error was harmless.  Here, on the contrary, petitioner did not request a specific instruction regarding the use of deadly force to resist a sexual assault.  Nothing in *Barker* calls into question the general rule that "[a] trial judge's failure to give an unrequested instruction is not an error cognizable in a federal habeas proceeding."  *Miller*, 1994 WL 102977, at *2 (citing *Manning*, 507 F.2d at 895).  Second, in *Barker* there was no question that the evidence presented by the petitioner was sufficient to warrant the giving of the specific sexual assault instruction.  In

20

petitioner's case, as noted above, there was simply no evidence presented at trial which would have supported the giving of such an instruction, and *Barker* does not abrogate the general rule that a petitioner is not deprived of a fair trial by the failure of a trial court to give an instruction which is not supported by the evidence.  *See Newton v. Million*, 349 F.3d 873, 879 n.3 (6th Cir. 2003) (rejecting petitioner's claim that *Barker* controlled his claim that the trial court erred in failing to give an instruction where the instruction was not supported by the evidence; the petitioner's argument "misconstrue[d] our holding in *Barker*," because a determination that there is insufficient evidence to support a requested jury instruction does not involve any weighing of the evidence presented, but simply a determination of whether any evidence, regardless of its credibility, was presented); *Gimotty*, 40 Fed. Appx. at 36 (rejecting petitioner's reliance on *Barker* for similar reasons).

Likewise, *Barker* is distinguishable with respect to petitioner's ineffective assistance of counsel claim.  Although *Barker* questioned the Michigan Supreme Court's weighing of the evidence in the context of the court's harmless error analysis, nothing in *Barker* suggests that its reasoning extends to an analysis of the prejudice prong of an ineffective assistance of counsel claim, which by its nature requires a court to weigh the evidence presented against counsel's alleged error. Rejecting a similar claim, the Sixth Circuit explained:

> *Barker* does not foreclose our analysis as set forth above, however, because it arose in a completely different context.  This court in *Barker* was evaluating a harmless-error analysis undertaken by a state court on direct review.  Here we are not reviewing the merits of the underlying claim, but are instead inquiring whether the alleged ineffective assistance of Benge's counsel in failing to object excuses the procedural default.  In evaluating claims of ineffective assistance of counsel, this court must typically assess the evidence introduced at trial in order to determine whether the defendant was prejudiced.  *See, e.g., Strickland*, 466 U.S. at 695 ("In making this determination [of whether the alleged ineffectiveness of counsel prejudiced the defendant], a court hearing an ineffectiveness claim must consider the

21

totality of the evidence before the judge or jury."); *Hodge v. Hurley*, 426 F.3d 368, 376 n.17 (6th Cir. 2005) ("[T]he prejudice determination is necessarily affected by the quantity and quality of other evidence against the defendant."). We see nothing in *Barker* to preclude our review of the evidence in assessing whether the ineffective-assistance claims excuses a procedural default. Benge's reliance on that case is therefore unavailing.

*Benge*, 474 F.3d at 249-50 (parallel citation omitted) (alterations by quoting court); *accord Henry v. Martin*, 105 Fed. Appx. 786, 792 n.7 (6th Cir. 2004) (citations omitted) (finding petitioner's reliance on *Barker* "misplaced. *Strickland* expressly directs courts to consider the strength of uncontested evidence in determining whether a defendant can establish that his counsel's performance was prejudicial. Moreover, while *Barker* provides that it is improper for a state court to weigh conflicting trial evidence when determining whether an error by the trial court was harmless, the case did not involve an ineffective assistance of counsel claim and therefore does not apply here.").

In short, petitioner was not denied a fair trial by the trial court's failure to give a specific sexual assault instruction *sua sponte* because a trial court's failure to give an unrequested instruction does not raise a cognizable habeas claim and because there was no evidence presented to support the giving of such an instruction; petitioner was not prejudiced by counsel's performance because the instruction was not warranted under state law and there is not a reasonable probability that the result of the proceeding would have been different had the instruction been given; and nothing in *Barker* compels a different conclusion with respect to either claim. Thus, petitioner's claims are without merit, and he will not be prejudiced by the application of the procedural bar to this claims.

3.     *Fundamental Miscarriage of Justice*

Under a second exception, known as the "fundamental miscarriage of justice" exception, petitioner can still have his procedurally barred claims reviewed if he can show that the

22

constitutional errors he alleges "'ha[ve] probably resulted in the conviction of one who is actually innocent.'" *Bousley v. United States*, 523 U.S. 614, 623 (1998) (quoting *Murray*, 477 U.S. at 496); *accord Kuhlmann v. Wilson*, 477 U.S. 436, 454 (1986).  "[T]o establish actual innocence, petitioner must demonstrate that, 'in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him.'" *Bousley*, 523 U.S. at 623 (quoting *Schlup v. Delo*, 513 U.S. 298, 327-28 (1995) (internal quotation omitted)); *accord Kuhlmann*, 477 U.S. at 455 n. 17 (citation omitted).

Although petitioner makes a general argument that he is factually innocent of the charges for which he was convicted because he acted in self defense, he has not presented any new, reliable evidence not presented in the state courts to show his innocence.  *See Schlup v. Delo*, 513 U.S. 298, 316 (1995) ("Without any new evidence of innocence, even the existence of a concededly meritorious constitutional violation is not itself sufficient to establish a miscarriage of justice that would allow a habeas court to reach the merits of a barred claim.").  Thus, this exception is inapplicable.

## II.  ORDER

In view of the foregoing, it is ORDERED that petitioner's application for the writ of habeas corpus is hereby DENIED.

S/Denise Page Hood
Denise Page Hood
United States District Judge

Dated:  March 31, 2009

I hereby certify that a copy of the foregoing document was served upon counsel of record on March 31, 2009, by electronic and/or ordinary mail.

S/William F. Lewis
Case Manager